UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 16-10268-IT |
| ) | |
| SONGJIANG WANG, ) | |
| ) | |
| Defendant. ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

For the reasons set forth below, the United States respectfully recommends that the Court sentence Defendant Songjiang Wang to a sentence of 63 months of incarceration, to be followed by three years of supervised release; a fine of $50,000; a forfeiture of $240,924.90; a special assessment of $300.00, and restitution. Such a sentence appropriately accounts for the nature and circumstances of this offense, which was a long-term, organized insider trading scheme involving an abuse of trust and significant efforts by the defendant to avoid detection. The government's recommended sentence promotes respect for the law and provides clear deterrence to those like the defendant who, despite enjoying significant financial and professional success, decide to defraud investors. Such conduct undermines the integrity of the financial markets and feeds public doubt in the institutions of economic life in the United States.

## LEGAL STANDARD

In imposing a sentence under 18 U.S.C. § 3553, a court must focus on the specific defendant and case before it. *See Gall v. United States*, 552 U.S. 38, 52 (2007). As an initial step, a sentencing court must properly calculate a guidelines sentencing range, but it must then consider each of the factors in 18 U.S.C. § 3553(a) to ensure "an individualized assessment based on the facts presented." *Id*. at 49-50. A sentencing court need not explain its consideration of each factor and may assign different weights to the factors given the circumstances of a specific case. *United States v. Vázquez-Vázquez*, 852 F.3d 62, 66 (1st Cir. 2017). The First Circuit considers the

"linchpin of a reasonable sentence" to be "a plausible sentencing rationale and a defensible result" that is "grounded on a sensible (though not obligatory) view of the circumstances." *United States v. Martin*, 520 F.3d 87, 96 (1st Cir. 2008).

## DISCUSSION

**I.      Sentencing Guideline Calculations**

      A.      <u>Probation's Calculation Should Be Adjusted In Light Of The Court's Rulings.</u>

Probation's calculation of the defendant's Total Adjusted Offense Level as 28 (PSR ¶ 46) should be adjusted in light of this Court's rulings at the sentencing of Wang's co-defendant, Schultz ("Jason") Chan. Specifically, in sentencing Chan, the Court excluded from the gain calculation Wang's trading in the stock of his employer, Merrimack Pharmaceuticals, Inc. ("Merrimack"), in his own name. Therefore, the Court should exclude from the calculation of the gain attributed to Wang, Chan's (and his wife's) trading in the stock of his employer, Akebia Therapeutics, Inc. ("Akebia"), because the gains resulting from that conduct may be attributed to Count 4 of the Second Superseding Indictment, which applies to Chan alone and was not necessarily the subject of the conspiracy between Wang and Chan.[1] Accordingly, the gain value for the purposes of determining the guideline range under U.S.S.G. §§ 2B1.4(b)(1) and 2B1.1(b)(1) is less than $1,500,000 but more than $550,000, with an upward adjustment of 14 points.

The following table summarizes the gain values relied upon by the United States.

---

[1] The United States notes that the Court also decided to exclude from its gain calculation the trades by Chan and Ying Jiang prior to November 2013 on the premise that the jury did not receive evidence that Wang possessed material non-public information ("MNPI") until November 2013. In fact, Wang's supervisor, Bruce Belanger, testified that Wang possessed and worked on MNPI in the "summer of 2013." Testimony of Bruce Belanger, June 29, 2018, Trans. at 18:10-21; *see also id.* at 42:15-23; 57:9-10. Accordingly, for the purposes of sentencing, the United States maintains that there is evidence that Wang possessed MNPI before November 2013 and that the conspiracy in this matter began prior to that date, as charged in the Second Superseding Indictment.

| INVESTOR | MACK | AKBA | TOTAL |
|---|---|---|---|
| Schultz Chan & Linda Wang | $919,005 | | $919,005[2] |
| Songjiang Wang & Yanqing Yang | $100,415 | $120,580 | $220,995 |
| Songjiang Wang Options | | $3,952 | $3,952 |
| Enhu Li & Ying Jiang | $232,547 | $63,330 | $295,877 |
| Hui Zhang | $8,680 | $33,694 | $42,374 |
| | $1,260,647 | $221,556 | **$1,482,203** |

Probation's calculation of the guidelines is otherwise correct. The Total Offense Level thus should be 26, or a guidelines sentencing range of 63-78 months.

B.  The Defendant's Objections

The defendant objects to Probation's gain calculation; to the inclusion of an enhancement for obstruction of justice under U.S.S.G. § 3C1.1; and to an offense level over 10.

1.  *Gain Calculation*

Probation used the correct methodology to calculate gain as a proxy for loss under U.S.S.G. § 2B1.4. The Court approved of Probation's methodology in sentencing Wang's co-defendant. Specifically, the Court rejected the argument that gain should be calculated using the arbitrary date on which a defendant sold stock that he purchased through securities fraud. Such a calculation would make the amount of a gain—and thus a defendant's purported culpability under the guidelines—dependent on unforeseen market events unrelated to the offense of conviction. Instead, the Court followed the logic adopted by numerous courts, according to which the gain should be determined in relation to the change in value of a stock attributable to the release of the MNPI at

---

[2] If the Court were to rule that gains attributed to trading by Chan and Jiang before November 2013 should not be counted, the gain assigned for MACK to Chan would be $907,465 and to Li and Jiang would be $219,878, with the overall gain reduced to $1,457,994, resulting in the same 14-point increase under §2B1.1(b). In addition, even if the Court were to exclude from consideration Chan's trading in MACK before November 2013 and all of Linda Wang's, Ying Jiang's, and Hui Zhang's trading in both securities in determining the gain for the purposes of Wang's GSR, the gain would be $938,401, representing $717,406 for Chan alone plus $220,995 for Wang. The adjustment under U.S.S.G. § 2B1.1(b) still would be an increase of 14 points.

3

issue in a case.  *See, e.g.*, *United States v. Riley*, 638 Fed. Appx. 56 (2d Cir. Jan. 14, 2016); *United States v. Nacchio*, 573 F.3d 1062 (10th Cir. 2009); *United States v. Wang*, No. 13CR3487 WQH, 2015 WL 1955045, at *8 (S.D. Cal. Apr. 29, 2015) ("[T]he Court concludes that the gain calculation under U.S.S.G. § 2B1.4 must be limited to the gain resulting from the deception of trading with insider knowledge in order to avoid an unreasonable application of the guidelines.  Including gain from holding the stock after the insider information was publicly disclosed . . . would result in different sentences for the same violation of law based solely upon the market conditions during the period prior to sale contrary to the goals of the Sentencing Guidelines.").  Here, Probation correctly used the price of Merrimack's stock and the price of Akebia's stock after each company released the MNPI in question on May 1, 2014 and September 9, 2015, respectively.

Wang also objects to Probation's inclusion of trades by Linda Wang, Ying Jiang, and Hui Zhang in the loss calculation because the government did not charge any of them.  Given the government's adjustment to the loss discussed above, Wang's objection may be academic because the defendant and the government agree that, however it may be calculated, the loss at issue is more than $550,000 and less than $1,500,000[3] and that therefore the increase under U.S.S.G. § 2B1.1(b) is 14 points.  Nevertheless, the Court should include trades by Linda Wang, Ying Jiang, and Hui Zhang in the loss calculations for the following reasons.

First, Linda Wang's trades should be included because, just as Wang traded in his wife's name, Chan caused trades by his wife, Linda Wang.  The comment to U.S.S.G. § 2B1.4 contains two distinct prongs for attributing another individual's trading activity to a defendant.  The first prong requires that a trader acted "in concert with" the defendant, and the second covers individuals

---

[3] The defendant argues that the $1,666,676.32 gain state in the PSR (¶ 22) should be reduced by $610,401.10 to exclude gains by Linda Wang, Ying Jiang, Enhu Li, and Hui Zhang.  With this adjustment, the gain (according to the defendant) would be $1,056,275.22.

4

"to whom the defendant provides inside information." U.S.S.G. § 2B1.4, unlike U.S.S.G. § 1B1.3 does not include a foreseeability requirement. *See United States v. Metro*, 882 F.3d 431, 440-41 (3d Cir. 2018); *United States v. Kluger*, 722 F.3d 549, 561 (3d Cir. 2013); *United States v. Martoma*, 48 F. Supp. 3d 555, 564 (S.D.N.Y. 2014). Here, based on the testimony of FBI Special Agent Jeffrey Jensen at the evidentiary hearing on November 5, 2018, the Court can find by preponderance that Linda Wang was effectively a proxy buyer for the co-defendant, Schultz Chan. Moreover, although foreseeability is not necessary, trades by Chan's wife should have been entirely foreseeable to Wang because Wang also caused trades by his own wife, Yanqing Yang.

Second, Ying Jiang's trades should be attributed to Wang because Jiang and Wang had an independent, insider trading relationship. The evidence received at trial shows that Jiang and Chan traded in Merrimack stock in a coordinated manner. For example, Chan and Jiang both purchased Merrimack stock on multiple days between November 18, 2013 and November 26, 2013 and between March 7, 2014 and March 12, 2014, often on the same day. *See* Trial Exhibits 255 and 256. Jiang also bought Merrimack stock on March 21, 2014. Trial Exhibit 256. At the evidentiary hearing on November 5, 2018, the Court received evidence that within about a week of that trade, Jiang and Wang had communications, including phone calls from Jiang's place of employment, and that Wang then bought the stock of Jiang's employer right before her employer released study results on a new drug. Wang's phone records also show repeated contacts with Jiang in the two weeks before Merrimack released the MNPI at issue in this case on May 1, 2014. *See* Wang Phone Records, attached as Exhibit A.[4] The Court can find by a preponderance that Jiang and Wang were exchanging inside information about their employer's products and that Wang should be responsible for Jiang's trades in relation to Wang's conspiracy with Chan.

---

[4] The exhibits to this memorandum have been filed separately under seal.

The Court should also count trades by Hui Zhang against Wang.  As the defendant Chan testified, Zhang, Wang, and Chan would all take walks together at lunch on a regular basis and occasionally talk about stocks.  *See* Testimony of Schultz Chan (July 5, 2015) Transcript at 122:21-25 ("We do it routinely."); 129:22-25 ("Q. You'd meet for lunch; you'd go for walks? A. Yeah, sometimes, yes. Q. With Ms. Zhang as well -- with Ms. Hui Zhang as well? A. Yes, because at that time she was at Novartis, very close[.]"); 130:23-131:2 ("Q. When you guys would go on your walks or go meet for lunch or interact, would you talk about stocks? A. Once in a while we talk about stocks from other companies, some other companies, various company stocks, yes, once in a while.").  The jury received evidence at trial that Chan communicated with Zhang and Wang immediately after he learned about the FINRA inquiry about trading in Akebia stock.  *See id.* at 122.  That evidence clearly demonstrates Zhang's part in the scheme.  Zhang and Wang also had a long-standing personal relationship independent of Chan that provides context for this case.  *See*, *e.g.*, Check from Zhang to Wang (Nov. 3, 2012) (Memo, "ski"), attached as Exhibit B.  Notably, on the morning of May 1, 2014, after Merrimack released study results, Wang received two phone calls, first from Zhang and then from Chan.  *See* Wang Phone Records for May 1, 2014.  In the overall context of this case, the Court can find that Wang should be held liable for Zhang's trading.

    2.    *Probation Properly Applied The Obstruction Of Justice Enhancement.*

The PSR correctly notes that Wang affirmatively misled federal law enforcement agents in an interview, both regarding his financial relationship with Chan and his structuring of funds to provide to Chan to buy Merrimack stock.  *See* PSR ¶¶ 29-30, 32.  The effect of Wang's obstruction in this case is evident in the case history.  Wang made his false statements to the FBI on June 10, 2016.  Chan was arrested and charged days later as to Akebia trading only.  Chan was indicted on September 13, 2016, again only as to Akebia trading.  Wang was not indicted until March 28, 2017,

as to Akebia and Merrimack trading. (Chan was also charged at that time regarding Merrimack trading.) The false statements Wang made effectively diverted the government for months.

The obstructive conduct here was not merely denials. Wang's false statements meshed with Chan's false statements, and Chan repeated them at trial. To be sure, Wang and Chan botched their cover-up when speaking with the FBI, but their similar stories demonstrate a coordinated, pre-planned effort to avoid detection of the insider trading scheme.

    3.    *The PSR Correctly Applied A Loss Enhancement Under U.S.S.G. § 2B1.4(b)(1).*

Wang objects to the PSR's overall computation of the offense level and suggests that it should be 10, based on a base offense level of 8 and a two-point enhancement only for abuse of trust. Wang's position is incorrect. First, without an enhancement for loss under U.S.S.G. § 2B1.4(b)(1), the base offense level would be 14 under U.S.S.G. § 2B1.4(b)(2) because, as this Court has already held, the offense involved an "organized scheme to engage insider trading." Second, where the gain resulting from the offense, as a proxy for loss, can be determined, U.S.S.G. § 2B1.4(b)(1) plainly applies. The PSR correctly applied it, looked to the loss table in U.S.S.G. § 2B1.1, and increased the offense level accordingly.

## II.  Sentencing Factors Under 18 U.S.C. § 3553(a)

After considering the sentencing factors in 18 U.S.C. § 3553(a), the Court should impose a substantial prison sentence for Wang.

First, as to the nature and circumstances of the offense, Wang's offenses were part of a calculated scheme in which he and his friend decided to profit in securities market by cheating. The evidence at trial showed that at Merrimack, Wang was among a very small group of people who had MNPI about the MM-398 study, could understand it, and could act on it. Wang betrayed Merrimack's trust in him.

Second, Wang's history and characteristics do not mitigate his conduct. He committed his crimes without being under any kind of extreme pressure or extenuating circumstance. By all accounts, Wang is a smart, genial, and capable professional. He received training at Merrimack that clearly warned him against tipping and put him on notice that insider trading is a crime. *See* Merrimack 2012 Training at 20-37, attached as Exhibit C. But he chose to commit securities fraud any way, motivated by greed. Moreover, Wang perpetrated his crimes with considerable guile. He structured withdrawals from his bank accounts, and he lied in coordination with Chan to try to avoid detection of his crimes, both in response to Merrimack's internal inquiry in response to FINRA and when speaking with the FBI. *See* Trial Exhibit 57, Wang E-Mail to Munsie, Sept. 3, 2014, attached as Exhibit D. His structuring and his false statements to the FBI both constitute additional crimes Wang committed in furtherance of the insider trading scheme.

Third, the sentence the Court imposes must reflect the seriousness of the offense, promote respect for the law, and provide sufficient general deterrence. As the First Circuit has noted, a "sentencing court may take into account the characteristics of the community in which the crime took place when weighing the offense's seriousness and the need for deterrence." *United States v. Zapata-Vázquez*, 778 F.3d 21, 23 (1st Cir. 2015); *see also United States v. Flores-Machicote*, 706 F.3d 16, 23 (1st Cir. 2013) ("[T]he incidence of particular crimes in the relevant community appropriately informs and contextualizes the relevant need for deterrence."). Here, the Court should consider the community in which the crime took place, but it need not do so in the abstract. The facts of this case involve a tight-knit community of biostatisticians in Boston, who together decided to abuse their special access to MNPI for personal profit. The persons directly involved in this case are all highly analytical, skilled professionals who routinely engage in risk/benefit analyses. An essential question for the Court in this case is what punishment for Wang is enough to deter people like him. If he could have factored a sentence into his decision to conspire with Chan and others,

8

what would have been enough to make him think that the risk was too high? The United States submits that its sentence recommendation is sufficient, but not more than necessary to achieve the necessary deterrence.

## CONCLUSION

For the foregoing reasons, the United States respectfully recommends that the Court sentence Defendant Songjiang Wang to a sentence of 63-months incarceration, to be followed by three years of supervised release, a fine of $50,000, a forfeiture of $244,877.30, a special assessment of $300.00, and restitution.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  /s/Kriss Basil
Jordi de Llano
Kriss Basil
Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed through the Electronic Court Filing system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

By:  /s/Kriss Basil
Kriss Basil
Assistant United States Attorneys